| Amount | From Account | To Account | Date |
|---|---|---|---|
| $ 400,000 | FGLIC Acct. No. 100057692 at 1ST Tenn. | Dreyfus NY Acct. No. 719 0791402712 | 3/23/98 |
| $ 600,000 | FGLIC Acct. No. 100057692 at 1ST Tenn. | Dreyfus NY Acct. No. 719 0360112270 | 3/2/99 |
| $1,888,000 | IFSLIC Acct. No. 10011 72693 at FANB | Dreyfus NY Acct. No. 719 0791361199 | 1/30/95 |
| $2,000,000 | IFSLIC Acct. No. 10011 72693 at FANB | Dreyfus NY Acct. No. 264 0791367121 | 3/7/96 |
| $32,000,000 | IFSLIC Acct. No. 10011 72693 at FANB | Dreyfus NY Acct. No. 719 0791402712 | 9/24/97 |
| $14,600,000 | IFSLIC Acct. No. 100057671 at 1st Tenn. | Dreyfus NY Acct. No. 719 0791402712 | 12/9/97 |
| $4,560,000 | FPLIC Acct. No. 10011 72431 at FANB | Dreyfus NY Acct. No. 264 0791367121 | 6/22/95 |
| $2,360,000 | FPLIC Acct. No. 10011 72431 at FANB | Dreyfus NY Acct. No. 264 0791367121 | 8/2/95 |
| $ 900,000 | FPLIC Acct. No. 10011 72431 at FANB | Dreyfus NY Acct. No. 264 0791367121 | 12/27/96 |

| Amount | From | To | Date |
|---|---|---|---|
| $5,280,000 | OSWLIC Acct. No. 100279796 1st. Tenn. | Dreyfus NY Acct. No. 719 0360115224 | 4/6/99 |
| $44,795,000 | FNLIC 1st Tenn. Acct. No. 100057727 | Dreyfus NY Acct. No. 719 079-1438435 | 4/9/99 |
| $7,287,504 | 1st Nat'l Bank of MD. Acct. No. 89487248 | FNLIC 1st Tenn. Acct. No. 100057727 | 11/6/98 |
| $2,134,101 | 1st Nat'l Bank of MD. Acct. No. 89487248 | FNLIC 1st Tenn. Acct. No. 100057727 | 1/19/99 |
| $5,267,988 | 1st Nat'l Bank of MD. Acct. No. 89487248 | FNLIC 1st Tenn. Acct. No. 100057727 | 2/25/99 |
| $69,000,000 | FALIC 1st Tenn. Acct. No. 100057708 | Dreyfus NY Acct. No. 719 0360111496 | 1/13/99 |

Once the assets has been removed from insurance company accounts, Frankel and his associates caused the insurance company assets to be wired to Switzerland into accounts at Banque SCS Alliance under Frankel's control. Once these funds were converted in this fashion, Frankel and his associates used these to fund, promote and further the fraud scheme through, among other means, the payment of expenses and wages of unwitting employees; to support Frankel and his associates' living expenses; and otherwise at the direction of Frankel and his associates.

Frankel purchased millions of dollars worth of travelers checks. Indeed, he ordered as much as $50,000 per week of American Express travelers checks from Banque SCS Alliance. These were delivered to various associates and co-conspirators and eventually delivered to 889 Lake Avenue. These travelers checks were used to pay employees and associates. They were also used to pay various vendors and other expenses at 889 Lake Avenue.

In August 1998, Banque SCS Alliance advised Frankel to stop purchasing such massive

quantities of travelers' checks. Therefore, Frankel utilized an alternative method for generating cash. One such method was to wire transfer $10,000 per week to Philip Miller, the owner of Highland Industrial Park Storage. After receiving the wire transfer, Miller would withdraw approximately $9,200 in cash. The cash was then delivered to Frankel at 889 Lake Avenue.

In addition, the following international financial transactions and transfers, among others, occurred at Frankel's and his associates' direction, involving the proceeds of the frauds committed by Frankel's criminal enterprise and with the intent to promote that criminal enterprise and the frauds it committed:

| | | |
|---|---|---|
| $50,000 | 11/18/96 | Shipment of travelers checks from Banque SCS Alliance, Geneva Switzerland to David Rosse, 1 Highland Avenue, Peekskill, New York, USA |
| $50,000 | 1/27/98 | Shipment of travelers checks from Banque SCS Alliance, Geneva Switzerland to Kaethe Moreau, a/k/a Kaethe Schucter, 146 West 57th Street, Apt. 5D, New York, New York, USA |
| $50,000 | 2/4/98 | Shipment of travelers checks from Banque SCS Alliance, Geneva Switzerland to Kaethe Moreau, a/k/a Kaethe Schucter, 146 West 57th Street, Apt. 50D, New York, New York, USA |
| $50,000 | 2/17/98 | Shipment of travelers checks from Banque SCS Alliance, Geneva Switzerland to Kaethe Moreau,, a/k/a Kaethe Schucter 146 West 57th Street, Apt. 50D, New York, New York, USA |
| $50,000 | 3/4/98 | Shipment of travelers checks from Banque SCS Alliance, Geneva Switzerland to Karen Timmins, 101 West 55th Street, Apt. 9G New York, New York USA |
| $2,758,515.27 | 7/13/98 | Wire transfer of funds for the purchase of 889 Lake Avenue, Greenwich, Connecticut from Banque SCS Alliance, Switzerland Acct. No. 70026 to the account of Robinson & Cole, LLP, Chase Manhattan Bank, New York, No. 778-5006-115-66. |
| $2,331,643.14 | 1/20/99 | Wire transfer of funds for the purchase of 895 Lake Avenue, Greenwich, Connecticut from Banque SCS Alliance, Switzerland, Acct. No. 70026 to Chase Manhattan Bank, Acct. No. 586-1-508728 in Connecticut |

17

| | | |
|---|---|---|
| $10,000.00 | 8/18/98 | Wire transfer of funds from Banque SCS Alliance, Switzerland, Acct. No. 70026 to the account of Highland Industrial Park, Hudson Valley Bank, Acct. No. 1101114901 Yonkers, New York |
| $10,000.00 | 8/28/98 | Wire transfer of funds from Banque SCS Alliance, Switzerland, Acct. No. 70026 to the account of Highland Industrial Park, Hudson Valley Bank, Acct. No. 1101114901 Yonkers, New York |
| $10,000.00 | 4/19/99 | Wire transfer of funds from Banque SCS Alliance, Switzerland, Acct. No. 70026 to the account of Highland Industrial Park, Hudson Valley Bank, Acct. No. 1101114901 Yonkers, New York |
| $10,000.00 | 4/26/99 | Wire transfer of funds from Banque SCS Alliance, Switzerland, Acct. No. 70026 to the account of Highland Industrial Park, Hudson Valley Bank, Acct. No. 1101114901 Yonkers, New York |
| $16,000,000 | 4/6/99 | Wire transfer of funds for the purchase of Vienna Philharmonic Gold coins from Banque SCS Alliance Account No. 70026 to Farmers and Merchants Bank, for the account of Monex, Acct. No. 01069446, California |
| $10,000,000 | 5/3/99 | Wire transfer of funds for the purchase of diamonds from Banque SCS Alliance, Switzerland, Account No. 70026 to the account of World Wide Diamonds, Bank Leumi, USA Acct. No. 01029319, Beverly Hills, California |

In order to maintain the fraud, throughout the operation of the scheme, Frankel, Howe and others arranged for the creation of bogus monthly statements to be sent to the insurance companies. These bogus monthly statements were generated using software and programs designed specifically for Frankel, and which utilized publically available data from the markets. At month's end, Frankel fabricated various phony "sales" and "purchases" of government securities, which were entered into the statements by Howe and others. These transactions appeared to generate significant profits for the insurance companies. In addition to the bogus statements, bogus confirmation slips were created for each fictitious trade.

In mid-1998, Frankel determined to expand his control of insurance companies. In connection with that plan, he and his associates formed the St. Francis of Assisi Foundation. As with the Thunor Trust, Frankel's involvement in, and control over, the SFAF was anonymous to all



but his associates. Frankel enlisted the help of numerous individuals to assist him in the identification of acquisition targets and to provide an air of legitimacy to the SFAF. Despite Frankel's efforts, no additional acquisitions came to fruition.

In approximately the latter half of 1998 and continuing through the Spring of 1999, audits and investigations of the Thunor Trust insurance companies and the SFAF by Tennessee and Mississippi state regulators raised several questions about the operations of these entities and their relationship with LNS, Inc. During this period, Mississippi regulatory officials submitted several questions regarding these issues. In April 1999, in response to these questions, Frankel and others prepared and filed fraudulent written responses to such questions with the Mississippi regulators.

During this period, Frankel and his associates, with the assistance of several additional individuals, continued efforts to acquire additional insurance companies through both the Thunor Trust insurance companies and the Saint Francis of Assisi Foundation. As with prior acquisitions, Frankel and his associates worked to keep his ownership and control of these entities, and his funding of the acquisitions concealed. Frankel and his associates arranged for the execution and submission of forms, statements, certifications and affidavits to sellers and regulators falsely stating that the funds to be used for the acquisitions came from sources other than Frankel and the Thunor Trust Insurance companies.

Among other acts, Frankel and his associates falsely represented that the funds to be used by the Saint Francis of Assisi Foundation for the acquisition of insurance companies had been obtained from Roman Catholic charities and tribunals. With the assistance of additional individuals, they tried to and did arrange for a process by which Frankel's funds would be passed through foreign bank accounts in the name of various foreign and religious entities, in order to conceal the source, nature and control of the funds. Frankel and his associates arranged for the execution and submission of statements, certifications and affidavits falsely stating that funds of over $1 billion, to be used by the Saint Francis of Assisi Foundation for the acquisition of insurance companies, had been obtained from Roman Catholic charities and tribunals.

From early 1998 through May 1999, Frankel, his associates and several additional individuals laundered the remaining insurance company assets by, among other methods, converting them to diamonds and precious metals. This was done to allow Frankel and others easy and untraceable access to the fraud proceeds should they need to flee the country. Frankel also made arrangements to obtain various fraudulent passports for himself and others in the event that he decided to flee the United States.

On or about March 29, 1999, Frankel and his associates arranged for SFAF to gain control of the Thunor Trust insurance companies by replacing the grantors. When this was disclosed to state regulators in Mississippi, those regulators ordered all of the various persons and interested parties to appear at a hearing on April 29, 1999. Prior to that meeting, on April 28, 1999 Frankel and various of his associates held a meeting with attorneys and other individuals ostensibly hired by SFAF and the Thunor Trust insurance companies. During this meeting Frankel, using the name

"David Rosse," and his associates made several false statements regarding the source and amount of funds held by SFAF, including that funds of over $1 billion had been provided by Roman Catholic Charities and tribunals. Frankel was aware that these and previous false statements were being used to seek both approval of SFAF's acquisition of the Thunor Trust companies and an end to the regulatory investigations. Frankel and his associates arranged for similar false statements to be made at the April 29, 1999 meeting with Mississippi regulators, though Frankel did not attend that meeting.

Shortly after the meeting, the Mississippi Insurance Department ordered the Mississippi companies into "supervision" and required that all of the liquid assets (over $160 million) be returned to Mississippi and held in a bank in that state. Before the money was due to be deposited back in the Mississippi banks, Frankel, with the assistance of a number of his associates, fled the United States for Italy. Once in Italy, Frankel arranged with several other individuals to launder additional stolen insurance company funds through a foreign company, in order to avoid the seizure of these funds.

The written stipulation above is incorporated into the preceding plea agreement. It is understood, however, that the defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

_____  
Martin R. Frankel  
The Defendant

_____  
Kari A. Dooley  
Assistant United States Attorney

_____  
Jeremiah Donovan, Esq.  
Attorney for the Defendant

_____  
Mark G. Califano  
Assistant United States Attorney

I hereby certify that the foregoing is a true copy of the original document on file. Date: 8/4/04

KEVIN F. ROWE  
Clerk

By _____  
Deputy Clerk

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § §3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

>A. Return the property to the owner of the property or someone designated by the owner; or

>B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

>>The greater of -

>>(I) the value of the property on the date of the damage, loss, or destruction;

>>or

>>(II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

The order of restitution shall be a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's resentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §3614. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555. Finally, the order of restitution has the effect of a civil judgment against the defendant.